THE PEOPLE *ex rel.* Walter E. Dwight, Plaintiff in Error, *vs.* THE CHICAGO RAILWAYS COMPANY *et al.* Defendants in Error.

*Opinion filed October 27, 1915—Rehearing denied Dec. 9, 1915.*

1. PLEADING—*filing a plea puis darrein continuance does not waive former pleas.* Under section 50 of the Practice act, as amended in 1907, the filing of a plea *puis darrein continuance* is not a waiver of former pleas.

2. SAME—*a replication admits sufficiency of plea in absence of new matter set up to avoid it.* A replication to a plea in *mandamus* admits the sufficiency of the plea as a bar to the relief sought by the petition unless the new matters set up in the replication are sufficient to avoid the legal effect of matters set forth in the plea.

3. SAME—*one must move to carry a demurrer back.* Where a plea is filed to a *mandamus* petition and there is also a replication to the plea, a demurrer to the replication will not be carried back to test the sufficiency of the plea unless the petitioner makes a motion to that effect, and the judgment of the court will be limited to the sufficiency of the replication.

4. CONSTRUCTION—*rules of construction of statutes apply also to ordinances.* The rules for the construction of an ordinance are the same as those applied in the construction of a statute.

5. STATUTES—*legislative intention is determined from the law itself.* While it is a primary rule of construction that the intention of the legislature must be ascertained and given effect, that intention must be determined from the language used in the act and not from statements of the author of the bill or by those interested in its passage or by members of the legislature.

6. ORDINANCES—*rule for construing an ordinance which is a proposition for a contract.* Where an ordinance is not enacted for the government of the public generally but is a proposition for a contract, justice to the party accepting the contract demands that

the legislative intention be determined from a consideration of the enactment itself.

7. SAME—*acts of a committee for submitting ordinance should not be considered in construing ordinance.* The acts of a committee having a proposed ordinance before it for consideration before it is presented to the council cannot be considered in determining the intention of the council in passing the ordinance, but this intention must be determined from the ordinance itself and the situation, disclosed by the pleadings, existing when it was passed.

WRIT OF ERROR to the Superior Court of Cook county; the Hon. CHARLES M. FOELL, Judge, presiding.

S. S. GREGORY, WILLIAM R. MOSS, and B. F. LANGWORTHY, for plaintiff in error.

JOHN J. HERRICK, and HORACE KENT TENNEY, for defendant in error the Chicago Railways Company.

JOHN W. BECKWITH, Corporation Counsel, and CHAS. M. HAFT, for defendant in error the city of Chicago.

Mr. JUSTICE COOKE delivered the opinion of the court:

On February 14, 1911, a petition was filed in the circuit court of Cook county in the name of the People of the State of Illinois, on the relation of Walter E. Dwight, president of the village of Oak Park, praying for a writ of *mandamus* requiring the Chicago Railways Company and the County Traction Company to forthwith establish and thereafter maintain a rate of fare of five cents for transportation of each passenger in one direction between the Seventy-second avenue terminals of the County Traction Company in the village of Oak Park (Seventy-second avenue being the western boundary of the village of Oak Park) and the eastern terminals of the Chicago Railways Company in the city of Chicago, the said terminals in the city of Chicago being in that portion of the city commonly known as the loop district. The right to this relief was by the petitioner based primarily upon section 3 of an ordi-

nance passed by the board of trustees of the village of Oak Park on June 4, 1903, which ordinance conferred upon the Chicago Consolidated Traction Company, as the successor of the Cicero and Proviso Street Railway Company, the right to maintain and operate street railways upon certain streets in the village of Oak Park until December 1, 1948. Said section 3, so far as here material, is as follows:

"Sec. 3. From and after the passage and acceptance of this ordinance the rate of fare for each passenger, for any one ride in one direction, between the Seventy-second avenue terminal points of the lines of said company in said village of Oak Park and the eastern terminal points of the lines of the Union Traction Company in the city of Chicago, which eastern terminal points shall be within that district of the city of Chicago bounded on the north by the Chicago river, on the west by the south branch of the Chicago river, on the south by VanBuren street and on the east by Lake Michigan, shall be five cents, and no more, during the entire term of its franchise in said village, which shall include the right to a ride in each direction over and along the following routes, namely:

"(*A*) Upon the Chicago avenue line in Oak Park by way of Chicago avenue and Forty-eighth avenue to the Lake street surface lines in the city of Chicago, and thence by transfer to the eastern extremity of said Lake street lines.

"(*B*) Upon the Lake street line in the village of Oak Park by way of the Lake street surface lines in the city of Chicago to Forty-eighth street, and thence by transfer to the eastern extremity of said Lake street line.

"(*C*) Upon the Madison street line in the village of Oak Park and the city of Chicago to West Fortieth street in the city of Chicago, and thence by transfer to the eastern extremity of said Madison street lines.

"(*D*) Upon the Twelfth street line in the village of Oak Park by way of Twelfth street to the eastern termi-

nus of said line, and thence by transfer upon the Union Traction lines to the eastern extremity of said Union Traction lines."

The obligation on the part of the County Traction Company to comply with the requirements of said section 3 was claimed by the petitioner to exist by reason of the fact that the County Traction Company had succeeded to the rights and franchises conferred by said ordinance on the Chicago Consolidated Traction Company, and was at the time of filing the petition herein operating the street railways in the village of Oak Park which had been formerly operated by the Chicago Consolidated Traction Company by virtue of said ordinance of June 4, 1903, and was and is therefore bound by all the terms and provisions of said ordinance. The obligation on the part of the Chicago Railways Company to comply with the requirements of said section 3 was claimed by petitioner to exist by reason of the fact, as charged in the petition, that the Chicago Union Traction Company, at the time of the passage and acceptance of the ordinance of June 4, 1903, owned, controlled and operated, under the name of the Chicago Consolidated Traction Company, the system of street railways in the village of Oak Park, and the acceptance of the ordinance by the Chicago Consolidated Traction Company was, in effect, the acceptance of that ordinance by the Chicago Union Traction Company; that the defendant the Chicago Railways Company is the successor of the Chicago Union Traction Company and is the beneficial owner of the street railway system in the village of Oak Park, and is operating the same under the name of the County Traction Company, and by reason thereof is bound by the terms and provisions of the ordinance of June 4, 1903.

For the purpose of supporting the charge that the provisions of said section 3 are binding upon the Chicago Railways Company, the petition sets forth substantially all the facts disclosed by the opinions in *Chicago Union Trac-*

*tion Co.* v. *City of Chicago,* 199 Ill. 484, and *Chicago Union Traction Co.* v. *City of Chicago,* 199 id. 579, which show the intimate relation existing between the Chicago Consolidated Traction Company and the Chicago Union Traction Company a short time prior to the passage of the said ordinance of June 4, 1903, and which we held in the last mentioned case established the charge there made that the Chicago Union Traction Company was the beneficial owner of the lines of street railways operated under the name of the Chicago Consolidated Traction Company, including the lines in the village of Oak Park. The petition then alleges that on or about April 22, 1903, receivers were appointed by the Federal court for the Chicago Union Traction Company and for the West Chicago Street Railroad Company and the North Chicago Street Railroad Company, respectively, the two companies last named being then the owners and lessors of a large portion of the street railway system operated by the Chicago Union Traction Company. It is further alleged that the Chicago Railways Company was organized under the laws of this State on October 30, 1903, for the purpose of re-organizing the street railway system of the Chicago Union Traction Company, including the lines operated under the name of the Chicago Consolidated Traction Company; that thereafter, as a result of negotiations between representatives of the Chicago Union Traction Company and its lessors and the city of Chicago, the city council of the city of Chicago, on February 11, 1907, passed an ordinance granting authority to the Chicago Railways Company, its lessees, successors and assigns, to construct, re-construct, maintain and operate, for the term of twenty years, (subject to the right of the city to purchase the same at any time,) a system of street railways in, upon and along certain streets in the city of Chicago upon which the receivers for the Chicago Union Traction Company were then operating street railways without any franchise from the city, one of the conditions

of the grant being that the Chicago Railways Company should within a specified time acquire all the property constituting the system of street railways then operated by the receivers for the Chicago Union Traction Company, and another condition being that the city of Chicago should receive fifty-five per cent of the net receipts from the operation of the system of street railways to be acquired by the Chicago Railways Company. The petition then sets out various steps taken in the suits in the Federal court in which receivers were appointed for the Chicago Union Traction Company, the West Chicago Street Railroad Company and the North Chicago Street Railroad Company, which culminated in a sale on January 25, 1908, by a special master commissioner, under a decree of the Federal court, of all the property, estate, rights, franchises, contracts, credits, choses in action and effects of the Chicago Union Traction Company, the West Chicago Street Railroad Company and the North Chicago Street Railroad Company, to a committee acting under a plan and agreement of re-organization and re-adjustment promulgated by the Chicago Railways Company and approved by the Federal court and by the city of Chicago, and the petition then alleges that on February 25, 1908, the special master commissioner, acting under order of the Federal court, conveyed the property thus purchased by the said committee to the Chicago Railways Company, as the assignee and successor in interest of the said committee. The petition alleges that thereafter, on or about June 1, 1908, default was made in the payment of interest on certain bonds of the Chicago Consolidated Traction Company, and foreclosure proceedings were brought in the circuit court of the United States for the northern district of Illinois to foreclose the mortgage securing said bonds, and receivers were appointed; that on October 6, 1910, a decree of foreclosure was entered and a sale of all the property of the Chicago Consolidated Traction Company was directed; that

accordingly, on November 30, 1910, all of the property of the Chicago Consolidated Traction Company was sold at public auction under said decree to one Andrew Cooke, acting for and on behalf of the Chicago Railways Company; that thereafter, on or about December 27, 1910, Andrew Cooke filed in said cause his petition asking that a portion of the property purchased by him at said sale be transferred to the Chicago Railways Company and the remainder thereof to the County Traction Company, which had been organized under the laws of this State on May 21, 1910, for the purpose of constructing, owning, purchasing, leasing or otherwise acquiring street railways in Cook county and in the cities, villages and municipalities of said county; that the court, upon the report of the special master as to said sale and upon the petition of Andrew Cooke, on December 27, 1910, ordered that the report be approved and the sale confirmed, and that the special master make conveyance of the property as Andrew Cooke might direct; that accordingly, by direction of Andrew Cooke, the special master on December 27, 1910, conveyed all the street railway property of the Chicago Consolidated Traction Company within the limits of the city of Chicago to the Chicago Railways Company, and all the remainder of the property of said company, being that portion without the city of Chicago and including the lines of railway in the village of Oak Park, to the County Traction Company.

From the petition it appears that the terminal or transfer points between the lines of street railway operated by the Chicago Railways Company and its predecessors and the lines of street railway operated under the name of the Chicago Consolidated Traction Company which extended into and through the village of Oak Park, were within the city of Chicago until the conveyances of December 27, 1910, above mentioned, were made, but that thereafter the terminal or transfer points between the railways operated by the Chicago Railways Company and those operated by

the County Traction Company were on the line between the city of Chicago and the village of Oak Park.

With reference to the incorporation of the County Trac-, tion Company, and the acquisition, on December 27, 1910, of the lines of street railway formerly operated by the Chicago Consolidated Traction Company outside the city of Chicago, including the lines in the village of Oak Park, the petition alleges that the County Traction Company was organized at the instance of the Chicago Railways Company and is virtually an agency or subsidiary thereof; that it is entirely controlled and dominated by the Chicago Railways Company and has no separate corporate existence or autonomy but is a mere dependency of the Chicago Railways Company, organized for the purpose of endeavoring to aid that company in escaping from its legal duties and obligations.

The petition alleges that the Chicago Railways Company having on February 25, 1908, acquired title to and possession of the street car properties formerly operated by the West Chicago Street Railroad Company, the North Chicago Street Railroad Company, the Chicago Passenger Railway Company, the Chicago Union Traction Company, and the subsidiary or suburban companies mentioned in *Chicago Union Traction Co.* v. *City of Chicago,* 199 Ill. 579, as having been merged in the Chicago Consolidated Traction Company, became, in law, liable for all the obligations of its predecessors, and accordingly, and in apparent recognition of this situation, continued to operate the lines of street railway in Oak Park and the connecting lines in the city of Chicago in substantially the same way they had been operated by the Chicago Union Traction Company and its receivers, and observed substantially all the conditions and provisions of the ordinance of June 4, 1903, securing to passengers a trip between the loop district in the city of Chicago and the village of Oak Park for one fare, until on or about December 27, 1910, when,

without any notice to the public authorities of the village of Oak Park, it suddenly discontinued this service and proceeded to carry passengers to the city limits of the city of Chicago and there compelled them to transfer and to pay an additional fare when they passed the city limits, and that since that time the Chicago Railways Company and the County Traction Company have refused to comply with the requirements of section 3 of the said ordinance of June 4, 1903, and insist upon charging two fares, of five cents each, for a trip between any point in the village of Chicago and any point in the village of Oak Park, wherefore the petitioner seeks a writ of *mandamus* against the Chicago Railways Company and the County Traction Company, as hereinbefore stated.

On May 17, 1911, by consent of all the parties, the cause was transferred from the circuit court to the superior court of Cook county, and on May 19, 1911, the city of Chicago was made a defendant to the petition, on the theory that by virtue of the terms and provisions of the ordinances under which the Chicago Railways Company was operating its street railway system in the city of Chicago the city was a necessary party to the proceeding. The Chicago Railways Company, the County Traction Company and the city of Chicago answered the petition, but as the cause, so far as the Chicago Railways Company and the city of Chicago are concerned, was finally determined upon the facts set forth in a plea thereafter filed, and as the rights of the County Traction Company are not involved upon this writ of error, it will not be necessary to mention any of the matters contained in the answers.

On April 2, 1913, the Chicago Railways Company filed a plea to the petition, which was adopted by the city of Chicago, in which it was alleged that on March 18, 1913, the city council of the city of Chicago passed an ordinance, which was thereafter, on March 20, 1913, signed by the mayor and accepted by the Chicago Railways Company,

authorizing the Chicago Railways Company to enter into an operating agreement with the County Traction Company with reference to the use of certain tracks in the town of Cicero, section 8 of this ordinance being as follows:

"Sec. 8. The consent, permission and authority hereby granted are so granted upon the express condition that the Chicago Railways Company shall not carry on any of its lines of railway in the city of Chicago or on any line authorized to be operated hereunder, without the payment of a cash fare to it, as provided by the ordinance of February 11, 1907, herein referred to, any passenger presenting a transfer issued on any line of street railway outside the limits of the city of Chicago, or carry any passenger over its said lines who has not paid a cash fare to it, on any transfer or transfers issued on any other lines of street railway, except such transfers as are expressly provided for and authorized by said ordinance of February 11, 1907, or the amendatory ordinance of October 10, 1910. Nor shall said Chicago Railways Company issue to any passengers transported on its lines within said city or on the lines authorized to be operated hereunder, any transfers entitling such passengers to be carried on any other lines of street railway, except such transfers as are expressly provided for and authorized by said ordinance of February 11, 1907, or said amendatory ordinance, and the aforesaid resolution or ordinance of the board of trustees of the town of Cicero shall expressly recite this provision of this ordinance: *Provided, however,* that it is not intended hereby to change, add to or detract from the said ordinances of February 11, 1907, and October 10, 1910, except as therein and thereby provided."

The plea sets forth the ordinance of February 11, 1907, and the ordinance of October 10, 1910, referred to in said section 8 of the ordinance of March 18, 1913, and a certain release executed in compliance with the ordinance of October 10, 1910. Among other provisions, the ordinance

of February 11, 1907, provides that the Chicago Railways Company shall be entitled to charge a fare of five cents for a continuous trip in one general direction, within the present or future limits of the city, over its street railways covered by the ordinance and all extensions thereof, whether owned, leased or operated by it, and that the company's obligation to pay the city fifty-five per cent of the net receipts from the operation of the system of street railways authorized by the ordinance is based upon its right to charge and receive the said rate of fare. It also provides that the Chicago Railways Company, at all times during the life of the grant, shall secure to passengers the same right of transfer between its lines and the connecting lines of the Chicago Consolidated Traction Company for continuous travel in one general direction, for a single fare, within the limits of the city of Chicago as if the lines of the Chicago Railways Company and the lines of the Chicago Consolidated Traction Company were owned and operated by the Chicago Railways Company under the provisions of the ordinance.

By the ordinance of October 10, 1910, it was recited that the receivers of the Chicago Consolidated Traction Company and of certain of its grantor and lessor companies were then maintaining and operating a system of street railways in certain streets and public ways in the north and west divisions of the city of Chicago, but that the right of said companies and of their receivers to maintain and operate important parts of such system had expired by virtue of the limitations and conditions of the ordinances applicable thereto, and that the right to maintain and operate other portions of said system would soon expire, and that the system was not then being operated so as to furnish adequate or proper street car service upon the streets and public ways on which such system was then located. The ordinance then refers to the provisions in the ordinance of February 11, 1907, reserving to the city the

270 – 7

right at any time to require the Chicago Railways Company to make extensions of and additions to the lines of street railway expressly authorized by that ordinance, and recites that the city desires and has determined to require the Chicago Railways Company to extend street railway lines in, upon and over said streets and public ways then occupied, without license or franchise from the city, by the said consolidated system. The ordinance authorizes and requires the Chicago Railways Company to construct, maintain and operate, in accordance with the provisions of the ordinance of February 11, 1907, extensions of and additions to its lines of street railway in, upon and along certain streets in the city particularly designated in the ordinance, and including all streets and portions of streets in the city upon and along which were located those lines of the Chicago Consolidated Traction Company specified in section 3 of the said ordinance of June 4, 1903, of the village of Oak Park. The ordinance of October 10, 1910, also provided that for the purpose of complying with its terms and provisions the Chicago Railways Company was thereby authorized to acquire all the street railway property that was located in said streets and public ways of the city of Chicago belonging to or claimed by the Chicago Consolidated Traction Company or its receivers, together with the equipment thereof, and that such property should be acquired free and clear from all liens and claims of every description, including the release, waiver or extinguishment of all and every right and claim, of every kind and nature, in respect to the location, maintenance or operation of street railways in the said streets or public ways of the city then vested or claimed to be vested in or to belong to the Chicago Consolidated Traction Company and other companies mentioned, including the Cicero and Proviso Street Railway Company, or in the receivers of any of said companies. It was further provided that during the period of the grant the Chicago Railways Company should

sell tickets at the rate of five cents each, which should entitle the holder to one continuous ride, either way, to or from any lawful stopping place in the city of Chicago at or east of Austin avenue (Austin avenue being the boundary line between the city of Chicago and the village of Oak Park on the west) on the Chicago avenue line, and Madison street, Lake street and Forty-eighth avenue lines, (those being the lines formerly operated by the Chicago Consolidated Traction Company over which passengers from the village of Oak Park were required to travel in order to reach the loop district of the city of Chicago,) from and to any station on the Lake Street Elevated railroad and the Union Elevated railroad.

The plea further alleges that at the time of the passage of the ordinance of October 10, 1910, and until December 27, 1910, all the property of the Chicago Consolidated Traction Company within and without the city was, and had been since June 24, 1908, in the possession of and was being operated by receivers appointed by the Federal court, but that upon the execution, on December 27, 1910, of the deeds referred to in the petition, possession of the property of the Chicago Consolidated Traction Company within the city of Chicago was delivered to the Chicago Railways Company and possession of that lying without the city was delivered to the County Traction Company. The plea further alleges that after the execution of said deeds the Chicago Railways Company, pursuant to the requirements of the ordinance of October 10, 1910, by a written instrument filed with the city, released to the city all the rights and claims in respect to location, maintenance and operation of street railways in the streets of Chicago vested or claimed to be vested in the Chicago Consolidated Traction Company and its grantor or lessor companies.

Thereafter, on April 2, 1913, the petitioner filed a replication to the plea, alleging that on March 10, 1913, the

city council of the city of Chicago passed an ordinance
which had been on February 24, 1913, reported to the
council by the local transportation committee, which was
in all respects identical with the ordinance set up in the
plea as having been passed on March 18, 1913, except that
section 8 of said ordinance did not contain the proviso
appended to said section in words and figures following:
"*Provided, however,* that it is not intended hereby to
change, add to or detract from the ordinances of Febru-
ary 11, 1907, and October 10, 1910, except as therein and
thereby provided;" that thereupon counsel concerned in
this case on behalf of the petitioner, on March 12, 1913,
saw the mayor of the city and various members of the
committee on local transportation regarding said ordinance,
and that accordingly, on March 13, 1913, the mayor caused
to be addressed to W. R. Moss, counsel for the petitioner,
a communication, which is set out in full in the replication.
The substance of this communication is that the clause of
which Moss had complained (section 8) was inserted in the
ordinance to protect the city against any conditions unpro-
vided for in the ordinance of February 11, 1907, which
would reduce the city's income from fifty-five per cent of
the net receipts of the Chicago Railways Company; that the
mayor did not feel justified in vetoing the ordinance, and
that the corporation counsel did not agree with the con-
tention of Moss that the interchange of transfers between
the Chicago Railways Company and the County Traction
Company would not affect the income of the city as fixed
by the ordinance of 1907, and that the corporation coun-
sel did not regard the insertion of section 8 in the ordi-
nance as finally settling the controversy in the courts. The
replication then alleges that thereafter, on March 18, there
was a meeting of the committee on local transportation,
at which Eugene Block, presiding, called the attention of
the committee to section 8 of the ordinance passed by the
city council on March 10, 1913, and that the following pro-

ceedings were had, as appears from a stenographic report taken at the direction of the committee:

The chairman caused to be read a letter addressed by him to the corporation counsel of the city of Chicago under date of March 12, asking whether section 8 of the ordinance, as passed on March 10, strengthens the case of the Chicago Railways Company in any degree in the suits pending in the courts for a five-cent fare to the western suburbs, and caused to be read the reply of the corporation counsel thereto, under date of March 13, to the effect that section 8 consists perfectly with the terms of the ordinances of February 11, 1907, and October 10, 1910, and neither adds to nor detracts from the prior ordinances but simply reiterates what was said in the prior ordinances and adheres thereto. After a discussion between certain members of the committee and a representative of the village of Oak Park and an assistant corporation counsel of the city of Chicago, the representative of the village presented an amendment which he claimed would relieve section 8 of its objectionable feature, and read from the opinion of Judge Foell rendered in disposing of a demurrer, in which he held that the ordinances of February 11, 1907, and October 10, 1910, did not prohibit the relief in this case. Alderman Long, one of the members of the committee, then asked the assistant corporation counsel whether the amendment presented by the representative of the village was desirable, and the assistant corporation counsel replied that it was not desirable from a legal point of view, and that it would be better to defeat the ordinance than to adopt that amendment,—that the amendment would not protect the city's rights. Alderman Long then stated that the committee did not want to act contrary to the advice of the corporation counsel. The representative of the village then stated that the corporation counsel understood that the city council desired to assist the Chicago Railways Company to win the cases. Alderman Long replied that

they did not want to legislate the villages out of court, and asked the assistant corporation counsel if he could not prepare an amendment that would not legislate the villages out of court, and whether there was any objection to an amendment which, so far as pending litigation was concerned, would leave the parties just where they were before. The assistant corporation counsel replied that there was no objection to that, and in his opinion the ordinance as theretofore passed accomplished that very thing. Alderman Long then stated that he did not think they should do anything that would throw the villages out of court, and the assistant corporation counsel replied that the villages were already thrown out by the 1907 ordinance. Alderman Long then suggested that the assistant corporation counsel prepare an amendment as he thought it ought to be and that the committee would indorse it. Shortly afterwards the secretary of the committee read a communication from the assistant corporation counsel which was accompanied by a proposed amendment to said section 8 and which the communication stated was in accordance with the request made by Alderman Long. The amendment prepared by the assistant corporation counsel and thus transmitted to the committee was the proviso to said section 8 as it appears in the ordinance of March 18.

The replication then alleges that on March 18, at the meeting of the city council, Eugene Block moved to reconsider the vote by which the council, at its last preceding meeting, passed said ordinance, which motion prevailed; that thereupon Alderman Block moved to amend said ordinance by adding said proviso to section 8, whereupon Stanley Kunz, a member of the council, arose and inquired the purpose of the proposed amendment; that the mayor, who was then presiding, directed that the amendment be read again, which was accordingly done, and that Alderman Kunz then stated that he did not understand the amendment, whereupon the mayor stated from the chair that it

had been suggested that the ordinance without the amendment might affect pending suits brought by western villages against the traction companies, and that the purpose of the amendment was to prevent the ordinance from prejudicing the rights of the towns in those cases; that thereupon Alderman Block arose and in substance repeated what had been said by the mayor, and after some further remarks (which are not set forth) the amendment was duly adopted, and that the said ordinance of March 18, 1913, was thus, and not otherwise, adopted by the unanimous vote of those present; all of which the petitioner is ready to verify.

The Chicago Railways Company and the city of Chicago filed general demurrers to the replication, which the court sustained, and the petitioner declining to plead further, the petition was dismissed as to the Chicago Railways Company and the city of Chicago and judgment was rendered in their favor for costs. In the meantime the name of the County Traction Company had been changed to Chicago and West Towns Railway Company, and the change in name had been brought to the attention of the court by the petitioner by an amendment to the petition, and subsequently, after a hearing, a writ of *mandamus* was awarded against the Chicago and West Towns Railway Company in accordance with the prayer of the petition. The petitioner has sued out this writ of error to reverse the judgment rendered in favor of the Chicago Railways Company and the city of Chicago.

The plea filed by the Chicago Railways Company setting up the ordinance of March 18, 1913, as a defense to the petition was, in effect, a plea *puis darrein continuance.* Under the law as it existed prior to the revision of the Practice act in 1907 this plea would have superseded the answer theretofore filed, and by operation of law the answer would have been stricken from the record and the matters set forth in the petition confessed. (*City of East*

*St. Louis* v. *Renshaw,* 153 Ill. 491; *People* v. *Kipley,* 171
id. 44.) Section 50 of the Practice act now provides that
the pleading of a plea *puis darrein continuance* shall not
waive former pleas, so that rule no longer applies. Instead
of demurring to the plea and thereby testing its sufficiency
as a defense to the cause of action stated in the petition,
plaintiff in error filed a replication admitting the facts stated
in the plea but setting up new matters intended to avoid the
legal effect of the plea as a defense to the petition. By fil-
ing the replication plaintiff in error conceded that the ordi-
nance of March 18, 1913, operated as a bar to the relief
sought by the petition unless the new matters set forth in
the replication were sufficient to avoid the legal effect of the
ordinance as a bar to the cause of action stated in the peti-
tion. (*Chicago Great Western Railway Co.* v. *People,* 179
Ill. 441.) The Chicago Railways Company demurred to
the replication, thereby admitting as true the new matters
set forth in the replication but challenging their sufficiency
to avoid the bar presented by the plea. The action of the
court in sustaining the demurrer to the replication amounted
to a holding that the new matters set forth in the replication
were not sufficient, in law, to avoid the bar presented by
the plea, and this was the extent of the holding of the trial
court in disposing of the case. The sufficiency of the plea
as a defense to the petition was not presented to the court
for determination, as no motion was made by plaintiff in
error to carry the demurrer back to the plea. (*Schofield*
v. *Settley,* 31 Ill. 515; *Mix* v. *People,* 86 id. 329; *Town
of Scott* v. *Artman,* 237 id. 394; *Heimberger* v. *Elliot
Switch Co.* 245 id. 448; *People* v. *Strawn,* 265 id. 292.)
The arguments of counsel in this court embrace numerous
questions which were not involved in the trial court in pass-
ing upon the demurrer to the replication and which are
therefore not before us for determination. The only ques-
tion proper for us to consider is whether, conceding the
ordinance of March 18, 1913, as set forth in the plea, to

be a bar to the relief sought by the petition, the new matters contained in the replication are sufficient, in law, to avoid the effect of that ordinance as a bar.

The new matters in the replication are set forth for the purpose of showing the intention of the city council in adopting section 8 of the ordinance of March 18, 1913, it being the contention of plaintiff in error that such new matters show that the city council did not by said section 8 intend to limit or enlarge the obligation of the Chicago Railways Company, under the ordinances of February 11, 1907, and October 10, 1910, to issue and accept transfers. The matters claimed to show such intention consist of certain letters read and statements made at a meeting of the committee on local transportation before the ordinance was submitted to the city council, and certain statements made at the session of the council at which the ordinance was passed. Whether these extraneous matters can be considered by the courts in construing section 8 of the ordinance of March 18, 1913, is the question presented to us for determination.

We have held that the rules for the construction of an ordinance are the same as those applied in the construction of a statute. (*People* v. *Hummel,* 215 Ill. 43; *People* v. *Mohr,* 252 id. 160.) It is a primary rule in the interpretation and construction of a statute that the intention of the legislature is to be ascertained and given effect. (*People* v. *Price,* 257 Ill. 587.) This rule does not, however, permit the courts to consider statements made by the author of a bill or by those interested in its passage, or by members of the legislature adopting the bill, showing the meaning or effect of the language used in the bill as understood by the person or persons making such statements. Thus, in *Belleville and Illinoistown Railroad Co.* v. *Gregory,* 15 Ill. 20, it was said: "Nor can the presumed or even well known views of all the members of the legislature be allowed to repeal an express provision of a law or to control

its construction. The law, alone, can speak the legislative will. When the courts shall be driven to the lobbies of the legislature to learn the sentiments of the members, for the purpose of construing the laws, a new rule of construction will have been adopted." Again, in *Eddy* v. *Morgan*, 216 Ill. 437, we said: "While journals and proceedings of the legislature are sometimes looked to in an endeavor to ascertain a proper construction of the statute, so that the court may have before it what is authentic that surrounded the enactment of the law, we are aware of no authority, and none has been pointed out, where the action of the lobby or the opinion of the legislators as individuals has been taken into account. In fact, we understand the rule to be otherwise and that such matters are inadmissible." In *United States* v. *Trans-Missouri Freight Ass'n*, 166 U. S. 290, the United States Supreme Court, in considering this subject, said: "There is, too, a general acquiescence in the doctrine that debates in Congress are not appropriate sources of information from which to discover the meaning of the language of a statute passed by that body. * * * The reason is, that it is impossible to determine with certainty what construction was put upon an act by the members of a legislative body that passed it, by resorting to the speeches of individual members thereof. Those who did not speak may not have agreed with those who did, and those who spoke might differ from each other, the result being that the only proper way to construe a legislative act is from the language used in the act, and, upon occasion, by a resort to the history of the times when it was passed."

While the language used in the cases above cited was used as applicable to the construction of statutes generally, an additional reason exists for refusing to consider the opinions of members of the legislative body as to the meaning of the proposed enactment, where, as here, the enactment is not for the government of the public gener-

ally, but is a proposition for a contract. In such cases justice to the party accepting the contract demands that the legislative intention be determined from a consideration of the enactment itself. *Belleville and Illinoistown Railroad Co.* v. *Gregory, supra.*

The principal matters intended to show the meaning of said section 8 as contended for by plaintiff in error, are the letters read and the statements made at the meeting of the local transportation committee. A further reason exists why these matters cannot be considered by the courts in construing that section. The ordinance was passed by the city council,—not by the local transportation committee,—and it does not appear from the replication that any of the correspondence referred to or any of the statements made at the meeting of the committee on local transportation were brought to the attention of the city council when the proposed ordinance of March 18, 1913, was submitted to the council. It is the intention of the city council which the courts must endeavor to determine,—not the intention of the members of some committee having the proposed ordinance before them for consideration before it was presented to the council. So far as this record discloses, the courts, in construing said section 8, are limited to the language used in the section, considered in connection with the situation existing between the Chicago Railways Company, the village of Oak Park and the city of Chicago at the time the ordinance was passed, which situation was fully disclosed by the petition and plea.

The replication set forth no new matters proper to be considered in construing said section 8. The demurrer thereto was therefore properly sustained.

The judgment of the superior court is affirmed

*Judgment affirmed.*